**LightGabler**
By: Glenn J. Dickinson (SBN 159753)
Brier Miron Setlur (SBN 273335)
760 Paseo Camarillo, Suite 300
Camarillo, CA 93010
(805) 248-7208
(805) 248-7209 (fax)
gdickinson@lightgablerlaw.com
bsetlur@lightgablerlaw.com

Attorneys for Defendants/
Counterclaimants Cold Steel, Inc., and
Good Sportsman Marketing LLC (sued
as GSM LLC) and Defendant Lynn
Thompson

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WORLD AXE THROWING LEAGUE, INC, and LINCOLN CHICAGO HOLDINGS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> COLD STEEL, INC., LYNN THOMPSON and GSM LLC d/b/a GSM OUTDOORS, <br><br> Defendants. | Case No. 2−20−cv−11407 JAK (Ex) <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Complaint Filed:  December 17, 2020 <br> District Judge:  John A. Kronstadt <br> Magistrate Judge: Charles F. Eick |
| AND RELATED CROSS-ACTION. | **Date:    August 1, 2022** <br> **Time:    8:30 a.m.** <br> **Ctrm:    10B** |

Defendants/Counterclaimants Cold Steel, Inc., and Good Sportsman Marketing LLC (sued as GSM LLC) and Defendant Lynn Thompson, respectfully submit the following Reply in Support of Motion for Summary Judgment.

1

# TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ................................................................. 4

II.   FACTS AND LEGAL ARGUMENT ....................................................... 4

    A.    The Axe Gang Hatchet and Professional Throwing Hatchet Complied with Published WATL Regulations ............. 8

    B.    The Plaintiffs Rely on Inadmissible and Unreliable Evidence ................................................................................... 9

    C.    The Defendants Have Established All Three Elements of the Fair Use Defense .......................................... 10

        1.    The Plaintiffs' League Is Not Readily Identifiable Without Using the League's Name ................................ 11

        2.    The Defendants Used No More of the Mark Than Necessary ...................................................... 12

        3.    The Defendants Did Nothing To Suggest Sponsorship or Endorsement......................................... 13

    D.    None of the Deemed Admissions Raises a Triable Issue of Fact.................................................................. 15

III.  CONCLUSION ................................................................................. 17

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

AMF, Inc. v. Sleekcraft Boats,
  599 F.2d 341 (9th Cir. 1979)........................................................ 13

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ................................................................... 4

Armstrong Cork Co. v. World Carpets, Inc.,
  597 F.2d 496 (5th Cir. 1979)........................................................ 14

Brother Records, Inc. v. Jardine,
  318 F.3d 900 (9th Cir. 2003)....................................................... 14

Interstellar Starship Servs., Ltd. v. Epix Inc.,
  184 F.3d 1107 (9th Cir. 1999)...................................................... 7

Inwood v. Ives,
  456 U.S. 844 (1982) ................................................................... 7

Lockheed Martin Corp. v. Network Solutions, Inc.,
  85 F. Supp. 949 (C.D.Cal.1997), aff'd, 194 F.3d 980 (9th Cir.1999) .......... 8

New Kids on the Block v. News America Publishing, Inc.,
971 F. 2d 302 (9th Cir. 1992)....................................................... 11

Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,
  149 F.3d 722 (7th Cir. 1998)....................................................... 14

Playboy Enterprises, Inc. v. Terri Welles, Inc.,
  78 F. Supp. 2d 1066 (S.D. Cal. 1999)........................................... 8

Thornhill Publ'g Co., Inc. v. GTE Corp.,
  594 F.2d 730 (9th Cir. 1979)....................................................... 7

Toyota Motor Sales, U.S.A., Inc. v. Tabari,
  610 F.3d 1171 (9th Cir. 2010).................................................. 12, 13, 14

**Rules**

Federal Rule of Civil Procedure, Rule 36(b) ................................. 15
Federal Rules of Evidence, Rule 407 ............................................. 7

I.   **SUMMARY OF ARGUMENT**

In the Opposition to Motion for Summary Judgment, Doc #47 ("Opposition"), the plaintiffs focus on new evidence in an effort to preclude application of the nominative fair use defense. Much of this evidence is speculative and without foundation or otherwise not entitled to any weight. Cold Steel's actual use of the WATL trademark fits well within the parameters of the defense. The defendants respectfully submit that summary judgment should be granted.

I.   **FACTS AND LEGAL ARGUMENT**

The question on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). As discussed in the Motion for Summary Judgment, and summarized below in section II.C, the defendants have presented evidence sufficient to establish each element of the fair use defense. This satisfies the initial burden of proof.

The plaintiffs do not raise any real dispute as to the evidence supporting the motion. Instead, the plaintiffs attempt to create disputed material facts by introducing additional evidence that purportedly negates one or more elements of the fair use defense. But the plaintiffs' evidence has a marked tendency to wander from the point and into allegations about supposed product defects, supposed ambition and greed on the part of the defendants, the plaintiffs' future prospects as an axe-throwing organization, and other matters that have nothing to do with fair use.

Perhaps more important, the plaintiffs rely on an overly expensive view of their evidence, repeatedly exaggerating and mischaracterizing the actual evidence they submitted. The plaintiffs also mischaracterize the defendants' contentions, aided by many gratuitous pejoratives directed at the defendants'

"hurried motion," "flippant use" of the plaintiffs' trademark, and so on. The defendants have admitted use of the plaintiffs' trademarks but have not admitted that this use constituted trademark infringement, as the plaintiffs' well know. The defendants respectfully request that the court take a hard look at the evidence, without being distracted by the statements of counsel.

The plaintiffs falsely claim that Cold Steel is continuing to use the WATL trademark: "Defendants unfairly compete with WATL by prominently advertising that their Cold Steel axes are 'WATL COMPLIANT' and/or 'complies with WATL Regulations' and/or are 'WATL APPROVED.'" Opposition, at 3:27 to 4:2. All of the evidence confirms that Cold Steel ceased using the WATL mark promptly upon receiving requests to do so.

The plaintiffs try to support their claims by bringing in irrelevant, and false contentions, regarding supposed predatory pricing by Cold Steel, and alleged ongoing defects in one model of Cold Steel's throwing axes. The first contention is pure speculation; it is supported by nothing more than the naked allegations of the plaintiffs' declarant Mario Zelaya, to which the defendants object.

The second contention is based on actual facts but, like so many of the plaintiffs' contentions, it is exaggerated to the point of misrepresentation. Cold Steel received one batch of Competition Throwing Hatchets that had defective handles. Declaration of Glenn J Dickinson to Reply in Support of Motion for Summary Judgment, Doc #38-1 ("Dickinson Declaration"), ¶ 2 and Exhibit 13 (Excerpts from deposition of Matt Bando), at transcript page 25:16-26:6. Cold Steel promptly offered free replacement handles. Id. The plaintiffs characterize this as a "recall," and they imply that frequent handle breakage is an ongoing problem even to this day. Opposition at 14:18-21. It is not an ongoing problem, and there was no "recall." And the plaintiffs' own designated witness testified that handle breakage in throwing hatchets is

common, particularly with beginners to the sport. Declaration of Glenn Dickinson in Support of Motion for Summary Judgment ("Dickinson Declaration"), ¶ 8 and Exhibit 10 (Excerpts from deposition of Jason Kearney), at transcript page 26:16-27:2; Declaration of Michael Machat in Opposition to Motion for Summary Judgment, Doc #47-28 ("Machat Declaration"), ¶ 11 and Exhibit 19 (Excerpts from transcript of Jason Kearney deposition), at transcript page 23:19-24:10. The plaintiffs' attorney claims that he has found a Cold Steel Amazon store page from Canada that still refers to WATL. Machat Declaration, ¶ 15, Exhibit 23. But the plaintiff's attorney has no way of knowing whether this is a page operated by Cold Steel, as opposed to some other seller. Cold Steel is not the only company selling Cold Steel products on Amazon.

A dominant theme throughout the plaintiffs' opposition is the use of Cold Steel's voluntary compliance with WATL's demands as evidence that Cold Steel admitted wrongdoing. Opposition at 15:14-15, 15:25 ff, 24:3-5. Evidence of subsequent remedial measures is inadmissible to prove wrongdoing. Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: … culpable conduct"). The innocent alternate motive for Cold Steel's actions was to avoid a needless lawsuit with an unreasonable and litigious company.

The plaintiffs also repeatedly use the characterization "retail partner" to describe retailers who sell Cold Steel products. This is yet another misrepresentation; there is no evidence of any supposed "partnership" between any of these companies and Cold Steel, or of any relationship at all. The plaintiffs have not shown that these retailers bought products directly from Cold Steel, as opposed to purchasing them from an independent distributor of Cold Steel products. The plaintiffs thus attempt to tarnish Cold

1  Steel with the wholly independent conduct of third parties. Proof of
2  contributory trademark infringement requires more than insinuations. <u>Inwood</u>
3  <u>v. Ives</u>, 456 U.S. 844, 854 (1982) (to establish contributory liability, plaintiff
4  must show that defendant either (1) "intentionally induce[d] another to
5  infringe" his or her trademark or (2) "continue[d] to supply its product to one
6  whom it knows or ha[d] reason to know [was] engaging in trademark
7  infringement").

8      Ultimately, none of this evidence raises a genuine dispute. As the
9  Opposition points out, at 7:5-9, conclusory and speculative testimony in
10 declarations or other evidentiary materials is insufficient to raise genuine
11 issues of fact and defeat summary judgment. <u>Thornhill Publ'g Co., Inc. v.</u>
12 <u>GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979) (affirming summary judgment
13 on jurisdictional grounds, where plaintiff failed to introduce evidence that
14 defendants' telephone directory substantially affected interstate commerce
15 within meaning of Sherman Act).

16     The plaintiffs argue that summary judgment is rarely granted in
17 trademark infringement cases. Opposition, at 1:2. This proposition might
18 apply to questions of likelihood of confusion, where the plaintiff and
19 defendant both are using similar trademarks to refer to their own services.
20 E.g. <u>Interstellar Starship Servs., Ltd. v. Epix Inc.</u>, 184 F.3d 1107, 1108-09
21 (9th Cir. 1999) (applying eight <u>Sleekcraft</u> factors where plaintiff used EPIX to
22 refer to its computer graphics design services, and defendant used EPIX to
23 refer to its video imaging hardware and software and related services). That
24 is not this case. Cold Steel is asserting nominative fair use of the plaintiffs'
25 mark to refer to the plaintiffs' services. "Although the Ninth Circuit has stated
26 that summary judgment is generally disfavored in trademark cases …
27 summary judgment is nonetheless appropriate 'where the party opposing the
28 motion fails to demonstrate the existence of any material issues of fact for

1  trial.'" <u>Playboy Enterprises, Inc. v. Terri Welles, Inc.</u>, 78 F. Supp. 2d 1066,
2  1072 (S.D. Cal. 1999), <u>aff'd in part, rev'd in part sub nom.</u> <u>Playboy</u>
3  <u>Enterprises, Inc. v. Welles</u>, 279 F.3d 796 (9th Cir. 2002), and <u>aff'd sub nom.</u>
4  <u>Playboy Enterprises, Inc. v. Welles</u>, 30 F. App'x 734 (9th Cir. 2002) (<u>quoting</u>
5  <u>Lockheed Martin Corp. v. Network Solutions, Inc.</u>, 985 F. Supp. 949, 956
6  (C.D.Cal.1997), <u>aff'd</u>, 194 F.3d 980 (9th Cir.1999) (affirming order granting
7  defendant's motion for summary judgment)).

8     **A. The Axe Gang Hatchet and Professional Throwing Hatchet**
9         **Complied with Published WATL Regulations**

10    The plaintiffs rely most heavily on the contention that neither the Axe
11 Gang Hatchet nor the Professional Throwing Hatchet met WATL regulations.

12    Regarding the Axe Gang Hatchet, the plaintiffs state that the handle is
13 too long to be used in WATL tournaments. Opposition, at 13:20-21. But the
14 WATL regulations consulted by Bando contained no maximum length.
15 Declaration of Matt Bando In Support of Motion for Summary Judgment, Doc
16 #38-3 ("Bando Declaration"), ¶ 3 and Exhibit 12, at 7. The regulation states,
17 "The handle may be made of wood, steel or plastic and length be at least 12
18 inches long, including the handle in the eye of the head of the axe." <u>Id.</u> No
19 maximum handle length is specified.

20    Further, the uncontradicted evidence is that the Axe Gang Hatchet
21 could be and was used in WATL tournaments. Jason Kearney, the owner of
22 a WATL licensee, described the widespread use of the Axe Gang as follows:

23         [E]verybody was throwing one, so much so that I bought one
24         and actually used it in the 2018 world championship. And that
25         one, I mentioned earlier that I've had since then with the
26         original handle. I still have it. I actually brought it to the 2019
27         championship as well.

28 Dickinson Declaration, ¶ 8 and Exhibit 10 (Excerpts from deposition of Jason

1  Kearney), at transcript page 30:11-15.

2      The plaintiffs offer no evidence the Cold Steel ever claimed the
3  Professional Throwing Hatchet complied with WATL regulations. Instead,
4  they offer purported evidence that a retailer named Oso Grande Knives
5  made this claim, and another retailer called NasGuns.com did as well.
6  Declaration of Mario Zelaya In Opposition to Motion for Summary Judgment,
7  Doc. #47-27 ("Zelaya Declaration"), ¶ 37 and Exhibit 11; id. ¶ 29 and Exhibit
8  6. The plaintiffs then insist they are entitled to assume Cold Steel also made
9  such a claim.

10     But the plaintiffs have the burden of proving Cold Steel made an
11 allegedly false claim about the Professional Throwing Hatchet. They cannot
12 sustain this burden by inviting inferences from the conduct of third parties,
13 whose relationship (if any) with Cold Steel is nowhere in the record, and
14 whose motives for their actions are a complete mystery.

15     Even if Cold Steel made such a claim, the published WATL regulations
16 consulted by Bando contained no specifications or restrictions prohibiting
17 removable axe heads. Bando Declaration, ¶ 3 and Exhibit 12, at 7.

18 **B.   The Plaintiffs Rely on Inadmissible and Unreliable Evidence**

19     The plaintiffs attempt to create genuine issues of fact by referring to
20 additional alleged uses of the WATL trademark. One of these instances
21 concerns an Instagram post. The plaintiffs cite Exhibit 4 to the Zelaya
22 Declaration as evidence of Cold Steel's alleged use of the WATL trademark
23 on Instagram. Opposition, at 12:22-27. The defendants separately object to
24 this evidence on the grounds that it does not prove use by Cold Steel.

25     The plaintiffs claim that the image was "captured by Mario Zelaya."
26 Opposition, at 12. However, Zelaya states in his declaration that he did not
27 obtain the image himself from Instagram but that it allegedly is "a screenshot
28 I received from a World Axe Throwing League affiliate." Zelaya Declaration,

9

¶ 28 and Exhibit 4. The affiliate might have been Benn MacDonald, who testified about seeing an Instagram post. Machat Declaration, ¶ 10 and Exhibit 18 (Excerpts from deposition of Benn MacDonald), at transcript page 30:18-23. But when asked how he knew the Instagram post was created by Cold Steel, his only answer was "I screenshot it." Id. Merely seeing a post on Instagram and taking a screenshot does not establish a foundation as to who created the post. In fact, there is no evidence that this alleged post was created by Cold Steel, as opposed to someone else. The evidence is not admissible to prove that Cold Steel used the WATL trademark in this manner.

Even if the document is considered for what it appears to be, it contains the true statement that the Competition Throwing Hatchet was "#NATF and #WATL legal." The defendants established this in the Motion for Summary Judgment. Motion, at 12-13. Although the plaintiffs argue that the Competition Throwing Hatchet was an inferior product, they do not dispute that it met WATL regulations. The plaintiffs also make a passing reference to YouTube but offer no evidence to substantiate the claim.

## C.    The Defendants Have Established All Three Elements of the Fair Use Defense

To establish the nominative fair use defense, a defendant must prove three elements:

> First, the [plaintiff's] product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the [plaintiff's] product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

1  New Kids on the Block v. News America Publishing, Inc., 971 F. 2d 302, 308
2  (9th Cir. 1992).

3      The plaintiffs have not negated any of these elements.

4      **1. The Plaintiffs' League Is Not Readily Identifiable Without**
5           **Using the League's Name**

6      As noted in the Motion for Summary Judgment, there are at least three
7  separate axe throwing organizations operating in the United States today.
8  One of them, formerly known as the National Axe Throwing Federation
9  (NATF), is usually mentioned alongside the WATL in the Cold Steel
10 documents. In fact, not a single alleged infringing advertisement mentions
11 solely the WATL. The plaintiffs acknowledge the existence of the NATF,
12 which has changed its name to IATF, for International Axe Throwing
13 Federation. Zelaya Declaration, ¶ 17. The other organization is the
14 International Knife Throwing Hall of Fame (IKTHOF). With this plurality of
15 leagues, the only way to inform consumers that certain Cold Steel products
16 specifically met the WATL regulations was to refer to WATL.

17     The plaintiffs attempt to dispute the point by a simplistic argument:
18 Cold Steel stopped using the WATL mark; Cold Steel continued to sell
19 products; therefore, Cold Steel had no need to ever use the WATL mark.
20 Opposition, at 21-22. If this contention were valid, then the fair use defense
21 would be completely nullified, because it is always possible to use alternative
22 descriptions of products and services. As the court stated in New Kids:

23         [O]ne might refer to "the two-time world champions" or "the
24         professional basketball team from Chicago," but it's far simpler
25         (and more likely to be understood) to refer to the Chicago Bulls.
26         … [R]eference to a large automobile manufacturer based in
27         Michigan would not differentiate among the Big Three; reference
28         to a large Japanese manufacturer of home electronics would

11

1    narrow the field to a dozen or more companies. Much useful

2    social and commercial discourse would be all but impossible if

3    speakers were under threat of an infringement lawsuit every

4    time they made reference to a person, company or product by

5    using its trademark.

6  971 F.2d at 306-07. One of the WATL licensees acknowledged that knowing

7  an axe was WATL compliant would affect consumers' purchasing decisions

8  in some circumstances. Machat Declaration, ¶ 10 and Exhibit 18, at

9  transcript page 41:16-21. Thus, Cold Steel had no practical way to refer to

10  the WATL regulations without identifying the organization by name.

11              **2.    The Defendants Used No More of the Mark Than**

12                      **Necessary**

13        It is undisputed that Cold Steel used only the word portion of the WATL

14  mark, not the logo associated with it. It also is undisputed that Cold Steel did

15  not use the red, white, and blue color scheme associated with the WATL

16  logo. Cold Steel thus did not use "the visual trappings of the [WATL] brand."

17  <u>Toyota Motor Sales, U.S.A., Inc. v. Tabari</u>, 610 F.3d 1171, 1181 (9th Cir.

18  2010) (defendant's use of stylized Lexus mark and "Lexus L" logo was more

19  use of mark than necessary and suggested sponsorship or endorsement by

20  Toyota).

21        The plaintiffs claim that Cold Steel still used more of the mark than

22  necessary. But a simple examination of the admissible evidence belies this

23  contention. In the Cold Steel webpage displaying the Axe Gang hatchet, the

24  largest and most prominent words are the product name, "Axe Gang

25  Hatchet," and the price, "$39.95." Dickinson Declaration, ¶ 4 and Exhibit 45.

26  The photo of the product itself is significantly larger than any of the type, as

27  are the two video boxes. The words "Meets NATF, WATL and IKTHOF

28  regulations" occur in the middle of the page, not at the top or bottom or

#1088034   DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1   otherwise offset for emphasis. They appear in the same type face as other
2   text, such as "Head: 21 oz. / Overall: 32 oz.", "Qty:", and "ADD TO CART."
3   They are not embellished in any manner that would call attention to them
4   specifically.

5   **3.    The Defendants Did Nothing To Suggest Sponsorship**
6   **or Endorsement**

7          The plaintiffs also mistakenly cite the eight-factor test from <u>AMF, Inc. v.</u>
8   <u>Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979). Opposition, at 9-10.
9   But in subsequent cases, the Ninth Circuit has clarified that "the <u>Sleekcraft</u>
10  analysis doesn't apply where a defendant uses the mark to refer to the
11  trademarked good itself. … [N]ominative fair use 'replaces' <u>Sleekcraft</u> as the
12  proper test for likely consumer confusion whenever defendant asserts to
13  have referred to the trademarked good itself." <u>Toyota Motor Sales</u>, 610 F.3d
14  at 1175.

15         The two witnesses the plaintiffs cite on this issue, Benn MacDonald
16  and Jason Kearney, gave testimony that does not create a triable issue.
17  MacDonald's testimony was largely speculative. Further, it is contradicted by
18  the documentary evidence; he claims that he "had read on the Cold Steel
19  website that the Competition Thrower was WATL approved." Declaration of
20  Michael Machat, ¶ 10 and Exhibit 18 (Excerpts from deposition of Benn
21  MacDonald), at transcript page 40:11-12. But the words "WATL approved"
22  never appeared on the Cold Steel website. The only documentary evidence
23  indicates that, for a time, the Cold Steel website stated that the Axe Gang
24  Hatchet "Meets NATF, WATL and IKTHOF regulations." Dickinson
25  Declaration, ¶ 4 and Exhibit 45.

26         Jason Kearney testified about his and others' alleged belief concerning
27  a relationship between Cold Steel and WATL, but he flatly acknowledged
28  that he did not know: "There was a lot of inferring. I think people assumed,

13

but I don't know of anyone that said that there was a direct relationship, business relationship between Cold Steel and WATL." Id. ¶ 8 and Exhibit 10 (Excerpts from deposition of Jason Kearney), at transcript page 33:9-12.

The testimony of these "insiders" is not probative as to the likelihood that an ordinary consumer would assume WATL's endorsement or sponsorship of Cold Steel products. Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 506 (5th Cir. 1979) (refusing to find likelihood of confusion based upon testimony of two business persons regarding short-lived confusion); Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 729 (7th Cir. 1998) (holding that confusion among sophisticated members of mortgage service industry who were not reasonable and prudent customers was not relevant)

It also is significant that the references in the exhibits include not only WATL but also NATF, and sometimes IKTHOF as well. These combined references would not lead a reasonable consumer to think specifically of a special relationship between Cold Steel and WATL.

The plaintiffs emphasize Brother Records, Inc. v. Jardine, 318 F.3d 900 (9th Cir. 2003), overruled on other grounds as recognized in Toyota Motor Sales, 610 F.3d at 1183, but the case is readily distinguishable. In that case, a former member of the Beach Boys who left the band continued to perform under the name, The Beach Boys "Family and Friends." Id. at 902. His promotional materials displayed the words "The Beach Boys" more prominently and boldly than "Family and Friends," thus suggesting sponsorship by the Beach Boys. Id. at 908. The court held that this precluded application of the nominative fair use defense. Id.

Cold Steel's limited reference to WATL, in conjunction with one or two other organizations, did not suggest sponsorship or endorsement by WATL. ///

D.  **None of the Deemed Admissions Raises a Triable Issue of Fact.**

Finally, the plaintiffs seek an advantage from Federal Rule of Civil Procedure 36(b), concerning deemed admissions. Opposition, at 16-17. The defendants address this issue in their separately filed Motion to Withdraw Admissions. However, even if the facts in the Requests for Admissions ("RFAs") are deemed admitted, they do not raise a triable issue of fact.

None of the alleged admissions directly concerns the fair use defense at all. RFA 3 alleges vaguely that Cold Steel used the WATL mark "for marketing purposes"; it may reasonably be argued that everything on a webpage selling a product is used "for marketing purposes." RFA 5 concerns the length of time during which Cold Steel used the WATL mark, but the Motion for Summary Judgment concerns the manner in which the mark was used, not the duration of time.

The alleged destruction of unspecified "evidence and emails" (RFA 7) does not raise a triable issue as to the character of Cold Steel's use of the mark. The allegedly wrongful acts were not done in secret, captured in secure email and document servers, and destroyed before the plaintiffs had a chance to view them. The allegedly wrongful acts were committed on publicly available websites that were fully accessible to the plaintiffs. The assumed destruction of unspecified "evidence and emails" in no way implies that the "evidence and emails" had any bearing on the fair use defense. To the contrary: there could hardly be any secret evidence, inaccessible to the plaintiffs, that would show the open and public use of the WATL trademark in advertising and marketing materials.

If Cold Steel customers "utilized the same descriptions of the accused products as Cold Steel used" (RFA 9), that would not raise any new issue at all. The point of the Motion for Summary Judgment is that Cold Steel made a

fair use of the mark. If third parties used the mark in the same way, this could establish that they, too, were entitled to the fair use defense. But it would not affect the application of the defense to Cold Steel.

The alleged giving of unspecified "free products" to axe throwers (RFA 11) in no way implies that the free products were associated with WATL. Cold Steel makes a wide range of products, including clothing and other promotional items, that are not at issue in this case.

Finally, even if it were true that Cold Steel "gave guidance to sponsored throwers to utilize the NATF or WATL trademarks" (RFA12), no issue is created as to the nominative fair use defense. The deemed admission does not state that any of the sponsored throwers actually used the WATL marks, which is the only way WATL's trademark rights would be implicated. And the use of the disjunctive "or" leaves open the possibility that the alleged guidance did not concern the WATL mark at all. Even adopting all the assumptions most favorable to the plaintiffs' position, a recommendation to "utilize the NATF or WATL trademarks" does not imply that WATL sponsors or endorses Cold Steel products. If anything, the suggestion of endorsement is just the opposite: Cold Steel endorses WATL.

None of the admissions urged by the plaintiffs creates a genuine issue of material fact.

///
///
///
///
///
///
///
///

16

## II.    CONCLUSION

For the foregoing reasons, the defendants respectfully request that the motion be granted.

Dated: May 3, 2022                          **LightGabler**

                                   By:   /s/ Glenn J. Dickinson
                                         Glenn J. Dickinson
                                         Brier Miron Setlur
                                         Attorneys for Defendants/
                                         Counterclaimants Cold Steel, Inc., and
                                         Good Sportsman Marketing LLC (sued as
                                         GSM LLC) and Defendant Lynn Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2022, a copy of the foregoing document was filed electronically with the Clerk of the Court using the Court's CM/ECF electronic filing system, which would send an electronic copy of this filing to all counsel of record.

/s/    Ellen Rivera

#1088034    DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT